# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  JOE ALAN WREYFORD and                          No. 7-12-12413 JS
       MARY M. WREYFORD,

      Debtors.

LOS ALAMOS NATIONAL BANK,

      Plaintiff,

v.                                                      Adversary No. 12-1312 J

JOE ALAN WREYFORD and
MARY M. WREYFORD,

      Defendants.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court following a two-day trial on the merits of this

adversary proceeding.   Los Alamos National Bank ("LANB") seeks to deny the discharge of Joe

Alan Wreyford and Mary M. Wreyford pursuant to 11 U.S.C. § 727(a)(2)(A)(transfer of estate

property made with intent to hinder, delay, or defraud a creditor); 11 U.S.C. § 727(a)(3)(failure

to preserve financial records); 11 U.S.C. § 727(a)(4)(false oaths); and 11 U.S.C. §

727(a)(5)(failure to explain loss of assets).  Mr. and Mrs. Wreyford own and operate a retail sales

business in Santa Fe, New Mexico.  They operated the business as a sole proprietorship for many

years, but formed a limited liability company *after* LANB filed a lawsuit against the Wreyfords

seeking a money judgment of over $2,000,000.  The Wreyfords transferred the business assets

they owned personally to their limited liability company *after* LANB obtained a judgment

against the Wreyfords in the amount of $2,293,835.70 and *after* counsel for LANB contacted the

Wreyfords' counsel in an effort to locate assets from which LANB could seek to satisfy its

judgment.   As explained below, the Court finds that these transfers satisfy the requirements to deny the Wreyfords' discharge under 11 U.S.C. § 727(a)(2)(A).[1]

FINDINGS OF FACT

*The Business*

The Wreyfords have operated a retail sales business in Santa Fe, New Mexico since approximately 1996, doing business as Xanadu.  The business sells furniture, rugs, folk art and jewelry to the public.   The Wreyfords operated their business as a sole proprietorship for many years.  At one time the business had three locations, but because of the economic downturn, the Wreyfords down-sized their business to one location on Cerrillos Road.  The tax returns for the Wreyfords' sole proprietorship for tax years 2006 and 2007 reflect business losses.  *See* Exhibits 46 and 48.  The building where the Wreyfords' business is currently located is leased and has an apartment attached to it.  The Wreyfords reside there.

Since about 2005, the Wreyfords' accountant advised them from time to time that they should form a corporation or limited liability company for their business to protect their personal assets from business debts.   The Wreyfords did not seek to form a business entity for their sole proprietorship until December of 2011, after LANB had initiated a lawsuit against the Wreyfords individually in 2010 and within three months of the trial in that action.

*The Wreyfords' Investment in Santa Fe Capital Equities, LLC and the Subsequent Litigation with LANB*

Sometime in 2008, the Wreyfords invested approximately $125,000 in Santa Fe Capital Equities, LLC ("SFCE").  SFCE was formed for the purpose of completing the development of certain real property in Santa Fe, New Mexico.   The Wreyfords held a 25% interest in SFCE.

---

[1]The Court need not, therefore, address LANB's remaining claims to deny the Wreyfords' discharge under 11 U.S.C. § 727(a)(3), (a)(4), or (a)(5).

The funds the Wreyfords invested in SFCE constituted the majority, if not all, of their retirement savings. SFCE obtained a loan from LANB, which the Wreyfords personally guaranteed.[2] LANB loaned the money to SFCE at a time when the Wreyfords were operating their business as a sole proprietorship.[3] SFCE's real estate development project was not successful and the Wreyfords lost their entire investment.

LANB filed a lawsuit against SFCE, the Wreyfords, and other guarantors in the First Judicial District Court in the State of New Mexico as Case No. D-101-CV-2010-1503 ("State Court Lawsuit") in 2010 seeking a judgment of over $2,000,000. SFCE asserted counterclaims against LANB in the State Court Lawsuit.

By September of 2011, the Wreyfords knew that the pre-trial conference in the State Court Lawsuit was continued to January of 2012, and that the non-jury trial, originally scheduled for October of 2011, was rescheduled for February of 2012. *See* Exhibit 1. On March 1, 2012, LANB obtained a judgment in the State Court Lawsuit against the Wreyfords and others, jointly and severally, in the amount of $2,293,835.70, plus interest from February 15, 2012 at the rate of 16% per annum. *See* Exhibit 5. The Wreyfords received a copy of the judgment from the State Court Lawsuit shortly after it was entered. As of April 2012, after LANB's foreclosure of real property pursuant to a foreclosure judgment entered in the State Court Lawsuit, a deficiency judgment remained against the Wreyfords in the amount of approximately $1,400,000.

---

[2] Before the formation of SFCE, an entity called Real Estate Investment Partners ("REIP") borrowed funds from LANB for a real estate development project. The project was failing and LANB was in the process of foreclosing on the loan to REIP when SFCE was formed with the Wreyfords as additional investors. LANB granted a new loan to SFCE so that SFCE could attempt to finish the project. *Testimony of Dan Castille.*

[3] *See* Exhibit 5 – Findings of Fact and Conclusions of Law, ¶ 62 ("LANB extended credit to SFCE in part based on the strength of the guarantors who showed a combined income of approximately $383,000, and cash on hand and other assets in excess of $7M."); Exhibit 44 – e-mail chain from October 2008 sent through Elizabeth J. Cavasos, Vice President – Loans at LANB, attaching the Wreyfords' bank account information in connection with the loan.

*The Formation of the Wreyfords' LLC*

In December of 2011, the Wreyfords sent to the New Mexico Public Regulation Commission ("PRC") business formation documents to form a limited liability company called Xanadu Santa Fe, LLC ("Xanadu, LLC"). The Wreyfords were forming Xanadu, LLC to operate their sole proprietorship business. After not hearing back from the PRC regarding the formation of Xanadu, LLC, Mr. Wreyford went to the PRC office in early 2012, before the trial in the State Court Lawsuit, to follow up on the business formation documents for Xanadu, LLC.

By letter dated February 29, 2012, the Wreyfords received notice from the PRC stating that the organizational papers for Xanadu, LLC had been approved. *See* Exhibit 4. The Certificate of Organization for Xanadu, LLC is dated December 23, 2011. The Wreyfords are the sole members of Xanadu, LLC, each owning a 50% membership interest. *See* Exhibit 3 – Operating Agreement of Xanadu, LLC. The Operating Agreement of Xanadu, LLC has an effective date of December 31, 2011. *Id.* The Wreyfords did not close the sole proprietorship bank accounts at that time or prior to the trial in the State Court Lawsuit.

Mr. Wreyford testified that he did not form Xanadu, LLC because of the State Court Lawsuit. He testified that he "was not concerned about losing [the State Court Lawsuit]" and that he is "positive that [he] was not worried about an adverse judgment" being entered against him. The Court does not find this testimony credible. The Court finds that although the Wreyfords formed Xanadu, LLC consistent with the advice of their professional advisors over the years to form an entity to protect personal assets from claims to collect business debts and business assets from claims against them personally, they formed Xanadu, LLC when they did to protect their business assets from LANB.

*The Wreyfords' Actions after LANB Obtained its Judgment in the State Court Lawsuit*

-4-

By March 7, 2012, and possibly earlier that month, the Wreyfords were aware that LANB had obtained a judgment against them. Over the years, the Wreyfords had assisted Mr. Patra, who is not a resident or citizen of the United States, by holding funds Mr. Patra earned from trade shows in one of the Wreyfords' sole proprietorship business accounts. On March 7, 2012, Mr. Wreyford sent an e-mail message to Mr. Patra indicating that "our situation has changed here and having any of your funds in one of our accounts or even your account that has my name associated with it has become a problem." *See* Exhibit 7. The Wreyfords understood that any funds held in a bank account owned by them individually or as a sole proprietorship could be seized or attached by LANB. Mr. Wreyford sent the e-mail message to Mr. Patra because he was concerned that LANB might attach funds that actually belonged to Mr. Patra.

On or about March 7, 2012, the Wreyfords consulted bankruptcy counsel, Moore, Berkson & Gandarilla, P.C. *See* Exhibit 6, Statement of Financial Affairs, reflecting a payment to Moore, Berkson & Gandarilla, P.C. dated March 14, 2012; *Testimony of Mr. Wreyford* that the Wreyfords sought legal advice about a week earlier. On March 8, 2012, counsel for LANB sent an e-mail message to the Wreyfords' counsel in the State Court Litigation requesting to take the Wreyfords' depositions in aid of execution of judgment. *See* Exhibit 8. Mr. Wreyford was not copied on the e-mail but at some point became aware that LANB was asking to take his deposition for the purpose of asking where his assets were located. Mr. Wreyford testified that he did not fully understand what that process would entail. On March 13, 2012, counsel for LANB sent another e-mail message to the Wreyfords' counsel again seeking to schedule the Wreyfords' depositions and expressing a concern about asset transfers. *See* Exhibit 15, e-mail from Jim Jurgens to Donald Walcott stating, "I don't want to delay the depositions any longer than is necessary as I am concerned about asset transfers."

On March 15, 2012, LANB filed a notice to take Mr. Wreyford's deposition, *duces tecum* in April 2012 as part of its collection efforts. *See* Exhibit 16. The Wreyfords did not appear for their depositions. The Wreyfords mistakenly believed that one of the other defendants in the State Court Litigation had filed bankruptcy, and that the automatic stay would apply to the Wreyfords as well. The Wreyfords did not produce any documents to LANB in April of 2012 in response to LANB's requests to take the Wreyfords' depositions, *duces tecum.*

*The Bank Accounts*

The Wreyfords' sole proprietorship maintained a bank account ending in 1382 at Bank of America (the "Sole Proprietorship Account"). *See* Exhibit 12. Mr. Wreyford had a money market account at Bank of America ending in 3857 (the "Money Market Account"). *See* Exhibit 11. The Wreyfords historically used the Money Market Account to cover shortfalls in their business operations.

The Wreyfords opened three accounts for Xanadu, LLC: a bank account at Bank of America ending in 4959 (the "Xanadu LLC Account"), opened on March 8, 2012 (the day after Mr. Wreyford's e-mail message to Mr. Patra motivated by Mr. Wreyford's concern about LANB seizing funds in his accounts); and a checking account and savings account at State Employees Credit Union ("SECU") ending in 3170 and 3180, respectively (together, the "Xanadu LLC CU Accounts"), both opened on May 2, 2012. *See* Exhibits 13 and 24. Mr. Wreyford had two other accounts at Bank of America: an account under the name J. Alan Wreyford, Sole Proprietorship d/b/a Jalan Collection ending in 5602 (the "Jalan Account"); and an account in the names of Inyoman Patra and J. Alan Wreyford ending in 7722 (the "Patra Account"). *See* Exhibits 9 and 10.

-6-

The Wreyfords did not close the Sole Proprietorship Account at the time that they opened the Xanadu LLC Account. They kept the Sole Proprietorship Account open because regular bill-pay debits continued to hit that account. The Wreyfords had to make arrangements with American Express to change the merchant account associated with the Sole Proprietorship Account to the Xanadu LLC Account. Through April 2012, the Wreyfords continued to use the Sole Proprietorship Account as well as the Xanadu LLC Account in connection with the operation of their business.

*The Transfers*

On March 8, 2012, the Wreyfords transferred $20,000 from the Money Market Account to the Sole Proprietorship Account, and then transferred $5,000 from the Sole Proprietorship Account to the Xanadu LLC Account. *See* Exhibits 11, 12, and 13. The $20,000 transfer from the Money Market Account to the Sole Proprietorship Account was made to cover a shortfall in the Wreyfords' Sole Proprietorship Account. Also on March 8, 2012, Mr. Wreyford transferred $52,000 from the Jalan Account and $19,000 from the Patra Account by wire transfer. *See* Exhibits 9 and 10. These funds were Mr. Patra's funds, and the wire transfers were sent to Mr. Patra.

On March 19, 2012, the Wreyfords transferred $25,000 from the Money Market Account to the Xanadu LLC Account. *See* Exhibits 11 and 13. Mr. Wreyford and Mrs. Wreyford, in consultation with counsel, funded the Xanadu LLC Account with $30,000 because that was the typical monthly expense amount for the operation of their business. Mr. Wreyford testified that at the time of the transfers to the Xanadu LLC Account, it did not cross his mind that he needed to protect the funds from LANB notwithstanding its judgment against him and Mrs. Wreyford; rather, all transfers were necessitated by the needs of the business. The Court does not find this

-7-

testimony credible. Mr. Wreyford formed Xanadu, LLC and transferred the sole proprietorship assets to it to protect the business assets from collection efforts by LANB.

On March 20, 2012, the Wreyfords funded an Individual Retirement Account ("IRA") for Mr. Wreyford for tax years 2011 and 2012 in the amount of $6,000 per year (a total of $12,000) from the Money Market Account. *See* Exhibits 11 and 14. On March 28, 2012, the Wreyfords funded an IRA for Mrs. Wreyford for tax years 2011 and 2012 in the amount of $6,000 per year from the Money Market Account (a total of $12,000). *See* Exhibits 11 and 18. The Wreyfords had never funded an IRA prior to tax year 2011. They had not previously qualified to fund an IRA, and were not aware that they could have funded IRAs in prior years had they operated their business differently.

On May 7, 2012, the Wreyfords funded the Xanadu LLC CU Account with $20,000. *See* Exhibit 24. The source of these funds is not clear, though Mr. Wreyford testified that the May transfer came from another limited liability account, and that the funds were transferred to the Xanadu LLC CU Account to cover shortfall in the account that arose as a result of the Wreyfords' inability to purchase inventory on credit. The Wreyfords opened the Xanadu LLC CU Account on advice of counsel so that the business bank account would not be at the same bank as the Money Market Account.

Ms. Wreyford generally relied on Mr. Wreyford to make all business and financial decisions and tried to distance herself as much as possible from the financial affairs of the business, though Mr. Wreyford would consult with her about major business and financial decisions. Although the Money Market Account is in the name of Mr. Wreyford, Mrs. Wreyford was aware of the transfers from the Money Market Account to the IRAs and to the Xanadu LLC Account and condoned them. She was aware of the transfers from the Money

Market Account to fund her IRA and "approved it absolutely." Mrs. Wreyford did not object to any of the transfers to the Xanadu LLC Account.

On or about May 29, 2012, both Mr. and Mrs. Wreyford executed a Bill of Sale transferring "all inventory, equipment, fixtures, trade fixtures, tenant improvements, accounts, general intangibles, trade names, executory contracts or leases, and all other assets of any type" used in the operation of the Wreyfords' sole proprietorship to Xanadu, LLC in exchange for "$10 and other and good consideration." *See* Exhibit 28. The equipment transferred on or about May 29, 2012 under the Bill of Sale consists of a 2003 Ford F-350 pickup, single axle utility trailer, computer and monitor, store sound system, and store TV. *See* Exhibits 28 and 29. The total estimated value of the equipment transferred under the Bill of Sale is $10,000. The estimated liquidation value of the inventory transferred on or about May 29, 2012 under the Bill of Sale is $25,000. The estimated value of the accounts transferred under the Bill of Sale is $23,000.

The Bill of Sale was prepared by the law office of Moore, Berkson, & Gandarilla, P.C. Mr. Wreyford steadfastly maintained on cross-examination that it did not cross his mind when he executed the Bill of Sale that LANB was attempting at the time to seize the Wreyfords' assets in an effort to collect on its judgment. According to Mr. Wreyford, the Bill of Sale and transfer of assets was simply a continuation of the formation of their limited liability company which began in November of 2011 and was not done to protect the assets from LANB. The Court does not find this testimony credible. The Wreyfords transferred assets to Xanadu, LLC by the Bill of Sale to protect the assets from LANB's collection efforts.

From January of 2012 through the end of April 2012, the Wreyfords continued to use both the Sole Proprietorship Account and the bank accounts opened for Xanadu, LLC. Thus, the Wreyfords operated their business in a hybrid form where some monies used or generated by

their business continued to flow through non-LLC accounts and some through the Xanadu LLC Account while the business equipment and inventory was not transferred to the limited liability company until the end of May.

The Wreyfords' business is their only source of income. At the time of the transfers to Xanadu, LLC and to the IRAs, the Wreyfords were nearing retirement age, and had no retirement savings. They resided at the leased business premises. LANB, by executing against the Wreyfords' sole proprietorship assets, could have forced the business to close, thereby depriving them of their only source of income and forcing them to find another place to live. To attempt to avert this fate, the Wreyfords formed a limited liability company, transferred the business assets to it, and funded new IRAs.

*The Bankruptcy*

LANB filed an involuntary petition for relief against the Wreyfords on June 26, 2012 pursuant to 11 U.S.C. § 103. The Wreyfords stipulated to an order for relief under Chapter 7 of the Bankruptcy Code on August 13, 2012. *See* Case No. 12-12413-j7, Docket No. 11. The Wreyfords listed the debts of their sole proprietorship in their bankruptcy schedules. They did not list in their Schedules the equipment or inventory they transferred to Xanadu, LLC pre-petition. The Wreyfords originally scheduled their interest in Xanadu, LLC with a value of $1.00. *See* Exhibit 33. They valued their interest in Xanadu, LLC at $1 because they mistakenly believed that the debts of the limited liability company were greater than its assets. Instead, because the majority of the business debts were incurred by the Wreyfords' sole proprietorship, and because Xanadu, LLC did not assume any of those debts, Xanadu, LLC had minimal debt when LANB commenced the involuntary bankruptcy case. The Wreyfords later amended their Schedule B to reflect that the value of their interest in Xanadu, LLC was "unknown." *See*

-10-

Exhibits F and G.  The Wreyfords claimed an exemption in the amount of $8,843.45 against their interest in Xanadu, LLC.  *See* Exhibit D.  On November 16, 2012, the Chapter 7 Trustee made a report of no distribution to creditors in the bankruptcy case.  *See* Case No. 12—12413-j7 - Docket Entry dated 11/15/12.

## DISCUSSION

LANB seeks to deny the Wreyfords' discharge under 11 U.S.C. § 727(a)(2)(A), which provides:

> The court shall grant the debtor a discharge, unless—
>  (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>   (A) property of the debtor, within one year before the date of the filing of the petition;

11 U.S.C. § 727(a)(2)(A).

LANB bears the burden of proof as to all required elements under 11 U.S.C. § 727(a)(2)(A) by a preponderance of the evidence.  *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1293 (10th Cir. 1997)("In order for a debtor to be denied a discharge under § 727(a)(2)(A), the objector must show by a preponderance of the evidence . . . "); *In re Keeney,* 227 F.3d 679, 683 (6th Cir. 2000)("The elements of a violation of 11 U.S.C. § 727 must be proven by a preponderance of the evidence to merit denial of discharge.")(citation omitted).  Under this section, a debtor is not entitled to receive a discharge if the debtor:  1) transfers property; 2) in which the debtor has an interest; 3) within one year of the petition date;  4) with the intent to hinder, delay, or defraud a creditor.  *See Brown,* 108 F.3d at 1293 (denial of discharge under 11 U.S.C. § 727(a)(2)(A) requires the creditor to establish the following four elements:  "(1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior

-11-

to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.").[4]  Actual intent is required for purposes of 11 U.S.C. § 727(a)(2)(A); constructive intent is not sufficient. *See In re Retz,* 606 F.3d 1189, 1196 (9th Cir. 2010)(stating that "'actual, rather than constructive, intent is required' on the part of the debtor")(quoting *Khalil v. Developers Sur. & Indem. Co. (In re Khalil),* 379 B.R. 163, 172 (9th Cir. BAP 2007), *aff'd,* 578 F.3d 1167, 1168 (9th Cir. 2009)).[5]

*Intent to Defraud is Required To Deny the Discharge Under Section 727(a)(2)(A)*

The phrase "hinder, delay, or defraud a creditor" is not defined in the Bankruptcy Code. Because the language is phrased in the disjunctive, some courts find that it is sufficient to deny a discharge under 11 U.S.C. § 727(a)(2)(A) if the debtor intends to hinder or delay a creditor, which may fall slightly short of fraudulent intent.  *See, e.g., Retz,* 606 F.3d at 1200 (stating that "[a] debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2)(A)[,]" and that, "[b]ecause the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor.")(citation omitted).[6]  Ordinarily, the Court would agree that

---

[4]*See also, In re Dennis,* 330 F.3d 696, 701 (5th Cir. 2003)(listing the four elements under §727(a)(2)(A)); *Keeney,* 227 F.3d at 683 (compressing the four elements into two:  "1) a disposition of property . . . , and 2) 'a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property.'")(quoting *Hughes v. Lawson (In re Lawson),* 122 F.3d 1237, 1240 (9th Cir. 1997)); *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3[d] Cir. 1993)(the exception to discharge under § 727(a)(2)(A) "consists of two components:  an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor).").
[5]*See also Equitable Bank v. Miller (In re Miller),* 39 F.3d 301, 306 (11th Cir. 1994)(intent to defraud under § 727(a)(2)(A) requires "actual fraudulent intent; constructive fraud is insufficient.")(citation omitted); *Matter of Chastant,* 873 F.2d 89, 91 (5th Cir. 1989)(same)(citations omitted).
[6]*See also, In re Bernard,* 96 F.3d 1279, 1281 (9th Cir. 1996)(denial of discharge under §727(a)(2)(A) "need not rest on a finding of intent to *defraud.* Intent to hinder or delay is sufficient.")(emphasis in original)(citation omitted); *Freelife Int'l, LLC v. Butler (In re Butler),* 377 B.R. 895, 915 (Bankr.D.Utah 2006)(same); *Adamson v. Bernier (In re Bernier),* 282 B.R. 773, 780 (Bankr.D.Del. 2002)(noting that the creditor must show *either* fraudulent intent *or* intent to hinder or delay); *Cuervo v. Snell (In re Snell),* 240 B.R. 728, 730 (Bankr.S.D.Ohio 1999)("Because § 727(a)(2) is in the disjunctive, it is unnecessary for the [Plaintiffs] and the Chapter 7 Trustee to prove fraud so long as they can establish the debtor's intent to hinder or delay.")(citing *Huntington Nat'l Bank v. Schwartzman (Matter of Schwartzman),* 63 B.R. 348, 360 (Bankr.S.D.Ohio 1986)); *Fox v. Schmit (In re Schmit),* 71 B.R. 587, 591 (Bankr.D.Minn. 1987)("Fraudulent intent is not necessary to sustain an objection to discharge under § 727(a)(2)(A) . . . . A finding that the debtor had actual intent to hinder or delay creditors is sufficient.")(citations omitted)); *Luwisch v. Rabinowitz (In re Rabinowitz),* 2012 WL 1072212, *7 (Bankr.D.N.J. Mar. 29, 2012)("Section 727(a)(2)(A) is disjunctive. Proof of fraudulent intent is not necessary; 'proof of an intent to hinder or delay will suffice.'")(quoting *Randolph v. Somerville (In re Somerville),* 73 B.R. 826, 834 (Bankr.E.D.Pa. 1987)(remaining citation omitted)).

-12-

"or" denotes the disjunctive, so that proof of intent to hinder or delay without proof of intent to defraud would be sufficient. However, the phrase, "hinder, delay, or defraud creditors" used in 11 U.S.C. § 727(a)(2)(A) has a specialized meaning in the law. It has its origin in the Statute of 13 Elizabeth 3 Eliz., ch. 5 (1570). *Coder v. Arts,* 213 U.S. 223, 242, 29 S.Ct. 436, 444, 53 L.Ed. 772 (1909).[7] "The statute of Elizabeth (chapter 5) against fraudulent conveyances has been universally adopted in American law as the basis of our jurisprudence on that subject . . . ." *Peters v. Bain*, 133 U.S. 670, 685, 10 S.Ct. 354, 359, 33 L.Ed 696 (1890). Notwithstanding use of the disjunctive "or" in the phrase "hinder, delay, or defraud creditors," this form of expression, as used in fraudulent conveyance law, has always been held to require actual fraud to invalidate a conveyance. *See Coder v. Arts*, 213 U.S. at 242 ("This form of expression [intent to hinder, delay, or defraud creditors] is familiar to the law of fraudulent conveyances, and was used at the common law, and in the statute of Elizabeth, and has always been held to require, in order to invalidate a conveyance, that there shall be actual fraud. . . .")[8]

Like 11 U.S.C. § 727(a)(2)(A), the fraudulent transfer provision found in 11 U.S.C. § 548(a)(1)(A) uses nearly the same phrase.[9] *Compare* 11 U.S.C. § 727(a)(2)(A)(("the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated,

---

[7] *See also, BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541, 114 S.Ct. 1757, 1763, 128 L.Ed.2d 556 (1994)("The 1898 Act [the Bankruptcy Act of 1898] specifically adopted the language of the Statute of 13 Elizabeth."); *Matter of Freudmann,* 362 F.Supp. 429, 433 (S.D.N.Y. 1973)(observing that the bar to discharge under § 14(c)(4) of the Bankruptcy Act "is of ancient origin . . . . [and] derive[d] from the early Statute of Elizabeth dealing with fraudulent conveyances which included the words 'intent to delay, hinder or defraud creditors.'")(quoting 13 Eliz.C.5));

[8] *See also, Panuska v. Johnson (In re Johnson),* 880 F.2d 78, 80, n. 1 (8th Cir. 1989)(observing that "[c]ourts generally view [the phrase, 'hinder, delay or defraud'] . . . as establishing a single test" and declining to try "to separate out the terms, fraud, hinder, and delay."); *Whitaker v. Mortgage Miracles, Inc. (In re Summit Place, LLC),* 298 B.R. 62, 70 (Bankr.W.D.N.C. 2002)(interpreting 11 U.S.C. § 548's fraudulent transfer provision using the same phrase, and acknowledging that while "[t]he elements of hinder, delay and defraud are three distinct elements which are viewed in the disjunctive, . . . . the phrase must be read consistently and with the intent of the law in mind" such that "any hindrance or delay must be fraudulent")(citing *Stratton v. Sioux Falls Paint and Glass (In re Stratton),* 23 B.R. 284, 287 (S.D. 1982)).

[9] Section 548 also derives from the Statute of Elizabeth. *See* S. Rep. 95-989, 95th Cong. 2nd Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. at 5875 ("This section [11 U.S.C. § 548] is derived in large part from section 67d of the Bankruptcy Act [of 1898]. It permits the trustee to avoid transfers by the debtor in fraud of his creditors. Its history dates from the statute of 13 ELIZ. C.5 (1570).").

-13-

or concealed . . . property . . .") *with* 11 U.S.C. § 548(a)(1)(A)("the debtor . . . made such transfer . . . with actual intent to hinder, delay, or defraud any entity . . .").[10]  Consistent with fraudulent conveyance law generally, 11 U.S.C. § 548(a)(1)(A) requires proof of actual intent to defraud.[11]  Ordinarily, identical words used in different parts of the same statute are construed to have the same meaning.  *Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990)("the normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning.")(citations and internal quotation marks omitted))[12]  The Court sees no reason to interpret the nearly identical phrase differently for purposes of § 727(a)(2)(A), especially given § 727's extreme penalty.[13]  The Court must construe

---

[10]The phrase "hinder, delay, or defraud a creditor also appears in 11 U.S.C. § 522(o) which limits a debtor's homestead exemption.

[11]*Matter of FBN Food Services, Inc.,* 82 F.3d 1387, 1394 (1996)(7th Cir. 1996)("Subsection 548(a)(1), which condemns transfers made 'with actual intent to hinder, delay, or defraud any entity to which the debtor was . . . indebted', goes by the label 'actual fraud' because of its intent ingredient."); *Zubrod v. Keffer (In re Keffer),* 307 B.R. 731, *4 (10th Cir. BAP 2004)(unpublished)(acknowledging that § 548(a)(1)(A) "requires a finding of fraudulent intent in order to avoid an allegedly fraudulent transfer."); *In re M & L Bus. Mach. Co., Inc.,* 155 B.R. 531, 539 (Bankr.D.Colo. 1993), *aff'd,* 164 B.R. 657 (D.Colo. 1994), *aff'd,* 84 F.3d 1330 (10th Cir. 1996)(requiring proof of  "actual fraudulent intent" to recover a transfer under § 548(a)(1)).

[12]*See also In re Agnew,* 355 B.R. 276, 284 (Bankr.D.Kan. 2006)(reasoning that "the case law interpreting the phrase 'intent to hinder, delay, or defraud a creditor' in 727(a)(2)(A) and 548(a)(1) . . . 'provides instructive guidance' when construing the same phrase in 522(o).")(quoting *In re Lacounte,* 342 B.R. 809, 814 (Bankr.D.Mont. 2005)).

[13]Section 548(a)(1)(A) uses the language "*actual* intent to hinder, delay, or defraud a creditor" (emphasis added); whereas Section 727(a)(2)(A) does not include the word "actual" before the phrase "intent to hinder, delay, or defraud."  The Court finds this to be a distinction without a difference.  *See In re Halinga,* 2013 WL 6199152, *5 Bankr D.Idaho Nov. 27, 2013)("Section 727(a)(2) requires actual, not constructive, intent despite the fact that the language of that section does not include the word 'actual' (unlike § 548(a)(1)).").  Section 548(a)(1)(A) and 548(a)(2)(A) often are referred to as the actual fraud and constructive fraud provisions of Section 548.  *See, e.g., BFP*, 511 U.S. at 535 (Section 548 "permits to be set aside not only transfers infected by actual fraud but certain other transfers as well—so-called constructively fraudulent transfers."); *In re Fruehauf Trailer Corp.,*444 F.3d 203, 210 (3rd Cir. 2006)(noting that § 548(a)(10A) prohibits actual fraud and that § 548(a)(1)(B) prohibits constructive fraud).  Section 727(a)(1) does not contain a constructive fraud provision.  The word "actual" before "hinder, delay, or defraud" in 11 U.S.C. § 548(a)(1)(A) apparently was used to contrast the actual fraud avoidance ground under that section from the constructive fraud avoidance ground under 11 U.S.C. § 548(a)(2)(A).

Many courts find that § 727(a)(2)(A)'s objection to discharge provision and § 548(a)(1)(A)'s actual fraudulent transfer provision have the same proof of intent requirement. *See, e.g. Cohen v. Bucci,* 103 B.R. 927, 930 (N.D.Ill. 1989), *aff'd,* 905 F.2d 1111 (7th Cir. 1990)(affirming bankruptcy court's application of collateral estoppel to claim objecting to discharge under § 727(a)(2)(A) based on prior adjudication of debtor's intent to hinder, delay, or defraud under § 548(a)(1); "the issue of intent under Section 727(a)(2)(A) is identical to the issue of intent under Section 548(a)(1)."); *Guttman v. Fabian (In re Fabian)*, 458 B.R. 235, 264 (Bankr. D.Md. 2011), *aff'd,* 475 B.R. 463 (D.Md. 2012), *aff'd,* 491 Fed.Appx. 420 (4th Cir. 2012)(same); *Krudy v. Hoetmer (In re Hoetmer)*, 2012 WL 4482387, *2 (Bankr.S.D.Ind. Sept. 26, 2012)(finding, based on the identical language in § 727(a)(2)(A) and § 548(a)(1)(A), that "proof of intent under both sections is the same.")(citation omitted)). *See also, In re Addison,* 540

the denial of discharge provisions "liberally in favor of the debtor, and strictly against the creditor." *Brown,* 108 F.3d at 1292 (citation omitted). *See also, Bezner,* 996 F.2d at 1534 (observing that "§727 is to be construed liberally in favor of the debtor and that a total bar to discharge is an extreme penalty."). Construing "hinder, delay, or defraud" found in 11 U.S.C. § 727(a)(2)(A) to require actual fraudulent intent when the objection to discharge is based on a debtor's intent to hinder or delay a creditor is consistent with that directive. It should not be easier to deny a debtor's discharge than it is to recover a fraudulent transfer. And requiring proof of fraudulent intent in order to deny a debtor's discharge is consistent with centuries of fraudulent conveyance law from which the phrase "intent to hinder, delay or defraud a creditor" is derived. It also comports with Tenth Circuit law in which the Circuit addressed the requirements of 11 U.S.C. § 727(a)(2)(A) but did not consider the disjunctive construction of the statute. *See Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991) [14] ("To deny a discharge under § 727(a)(2), a court must find actual intent to defraud creditors.")(citations omitted)).

> *The Court Should Consider the Evidence in Light of the Badges of Fraud to Determine Whether The Debtors Acted With the Requisite Fraudulent Intent for Denial of the Discharge Under Section 727(a)(2)(A)*

Because actual fraudulent intent is seldom based on direct evidence, courts rely on circumstantial evidence often referred to as "badges of fraud" from which fraudulent intent under Section 727(a)(2)(A) may be inferred. *See, Ng v. Adler (In re Adler)*, 494 B.R. 43, 65 (Bankr. E.D.N.Y. 2013)("Courts will find the requisite intent 'to hinder, delay, or defraud' a creditor [under Section 727(a)(2)(A)] from either: (1) direct or explicit proof, a rarity, or (2) a

---

F.3d 805, 811 (8th Cir. 2008)(looking to case law interpreting "hinder, delay, or defraud" under § 548(a)(1)(A) and § 727(a)(2)(A) to interpret § 522(o)); *Agnew,* 355 B.R. at 284 (intent requirement under § 522(o) is the same as for § 727(a)(2)(A) and § 548(a)(1)(A)).

[14]In *Carey*, the creditor objected to the debtor's discharge under 11 U.S.C. § 727(a)(2)(A) based on the debtor's pre-petition conversion of non-exempt assets into exempt assets.

preponderance of circumstantial evidence of a debtor's illicit intent, the so-called 'badges of fraud'")(citations omitted)); *United States Trustee v. Sieber (In re Sieber)*, 489 B.R. 531, 545 (Bankr. D.Md. 2013)(courts rely on badges of fraud to determine fraudulent intent for purposes of § 727)(citations omitted)); *AB & T Nat'l Bank v. Goodwin (In re Goodwin)*, 488 B.R. 799, 806 (Bankr. M.D.Ga. 2013)(same).[15]  Like the meaning of "intent to hinder, delay, or defraud," the reliance on badges of fraud to determine whether the requisite fraudulent intent is present derives from English law. *BFP*, 511 U.S. at 540-41.

The badges of fraud include:

(1) the lack or inadequacy of consideration;
(2) the family, friendship or close associate relationship between the parties;
(3) the retention of possession, benefit or use of the property in question;
(4) the financial condition of the party sought to be charged both before and after the transaction in question;
(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6) the general chronology of events and transactions under inquiry.

*In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008)(citations omitted)); *Moore v. Lang (In re Lang),* 243 B.R. 463, 469 (Bankr.D.Mass. 2000)(same)(citations omitted)).[16]

Additional indicia of fraud courts apply to determine whether a transfer was made with actual intent to hinder delay or defraud creditors include:

---

[15]*See also Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1339 (10th Cir. 1998)("[U]nder 11 U.S.C. § 548(a)(1) bankruptcy courts consider . . . . badges of fraud as evidence of actual fraudulent intent.")(citation omitted)); *Marrama v. Citizens Bank of Mass.* (*In re Marrama),* 445 F.3d 518, 522 (1st Cir. 2006)(observing that, "[b]ecause a debtor rarely gives direct evidence of fraudulent intent, we have recognized that . . . intent to defraud a creditor can be proved by circumstantial evidence.")(citation omitted)); *Emmett Valley Assocs. v. Woodfield (In re Woodfield),* 978 F.2d 516, 518 (9th Cir. 1992)("Certain 'badges of fraud' strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears."); *Agnew,* 355 B.R. at 284-285 ("Fraudulent intent can seldom be proven by direct testimony and is generally established by inference from specific indicia of fraud.")(citation omitted); *Holber v. Jacobs (In re Jacobs),* 381 B.R. 147, 164 (Bankr.E.D.Pa. 2008)(noting that "[f]raudulent intent may be inferred from circumstantial evidence of a course of conduct . . . because courts recognize that it is unlikely that a debtor will . . . admit to being motiv[ated] by fraud.")(citation omitted)).. *Cf. Brown,* 108 F.3d at 1293 (stating that "[t]he circumstances of the transaction must be examined" to determine whether they support an inference of fraud, and reviewing the bankruptcy court's application of the badges of fraud).
[16]*See also, Carey,* 938 F.2d at 1077 (listing similar indicia of fraud from which a debtor's fraudulent intent may be inferred).

-16-

(7) whether the transfer was disclosed or concealed;
(8) whether the debtor made the transfer before or after being threatened with suit by creditors (a variant of factor (5));
(9) whether the transfer involved substantially all of the debtor's assets;
(10) whether the debtor absconded; and
(11) whether the debtor was or became solvent at the time of the transfer.

*Frierdich v. Mottaz*, 294 F.3d 864, 870 (7th Cir. 2002)(the Seventh Circuit also listed some of the badges of fraud recited in items 1 through 6 above).  *See also Dionne v. Keating (In re XYZ Options, Inc.),* 154 F.3d 1262, 1271 (11th Cir. 1998) (applying similar indicia of fraud).

These are similar to the non-exclusive list of badges of fraud set forth in the Uniform Fraudulent Transfer Act.  *See Taylor*, 133 F.3d at 1338 (listing the badges of fraud under the Uniform Fraudulent Transfer Act).

Not all badges of fraud must be present before a Court may infer fraudulent intent; nor need they be given equal weight.  *See Woodfield*, 978 F.2d at 518 (not all badges of fraud need be present in order to infer fraudulent intent from the circumstances surrounding the transaction); *Zanderman, Inc. v. Sandoval (In re Sandoval),* 153 F.3d 722, *2 (4th Cir. 1998)(unpublished) (suggesting that "[t]he presence of just one of the above listed factors can warrant a court's conclusion that a transfer was fraudulently made . . .")(citation omitted); *Pher Partners v. Womble (In re Womble),* 289 B.R. 836, 854 (Bankr.N.D.Tex. 2003), *aff'd,* 299 B.R. 810 (N.D.Tex. 2003), *aff'd with respect to § 727(a)(3) claim,* 108 Fed.Appx. 993 (5th Cir. 2004)(stating that "[o]ne of these factors may be sufficient to find actual fraudulent intent; an accumulation of several such factors strongly indicates that the debtor possessed the requisite intent.")(citations omitted).  *See also* 5 Collier on Bankruptcy, ¶ 548.04[1][b][ii] (Henry Sommer & Alan Resnick, eds., 16th ed. 2012) ("Whatever badges of fraud a court uses, no particular badge is necessary, nor is any combination sufficient.  The matter is always factual . . . ").

-17-

Fraudulent intent to hinder or delay a creditor means "an intent to improperly make it more difficult for creditors to reasonably collect on their debts." *Womble,* 289 B.R. at 854.

*The Court Will Deny the Debtors Discharge*

With these standards in mind, the Court will examine the evidence. LANB has easily satisfied the first three required elements for denial of discharge under 11 U.S.C. § 727(a)(2)(A): 1) the Wreyfords transferred property (i.e., funds from the Money Market Account, the Sole Proprietorship Account, and equipment and inventory of the sole proprietorship); 2) the transferred property belonged to the Wreyfords individually; and 3) the transfers occurred within one year before the date that LANB filed the involuntary petition. What remains at issue is whether the Wreyfords made the transfers with the requisite intent to hinder, delay, or defraud a creditor.

The Court finds that the Wreyfords acted with actual fraudulent intent by transferring their property for the purpose of hindering and delaying LANB's collection efforts. The Court makes this finding based on the circumstances surrounding the formation and transfers of assets to Xanadu, LLC and the funding of the Wreyfords' IRAs.[17] Factors (2), (3), (4), (5), (6), (7), (8) and (9) of the badges of fraud listed above all support this finding.

Although the Wreyfords had been advised for many years by their accountant to change their business form from a sole proprietorship to a limited liability company or corporation, they did not form Xanadu, LLC until *after* LANB filed the State Court Lawsuit. They began transferring assets to Xanadu, LLC shortly after LANB obtained its $2.3 million judgment against them to prevent LANB from executing against the assets. While resisting LANB's discovery in aid of execution of its judgment, and knowing that LANB was attempting to collect

---

[17]The Court is not suggesting that the transfers to fund the Wreyfords' IRAs alone would have resulted in a denial of the Wreyfords' discharge.

its judgment, the Wreyfords transferred some $112,000 of assets to their newly formed limited liability company or to their new IRAs over a period of approximately three months: at least $30,000 of cash, $25,000 of inventory at liquidation value, $10,000 of equipment and $23,000 of accounts receivable were transferred to the limited liability company; and $24,000 was transferred to fund IRAs. The Wreyfords concealed those transfers from LANB until after they were completed.

LANB extended the loan to SFCE based in part on the strength of the Wreyfords' assets at that time – the majority of which were the business assets of the Wreyfords' sole proprietorship. Yet by the time LANB obtained its judgment and actively began its efforts to collect, the Wreyfords were frantically moving assets to the Xanadu, LLC to prevent LANB from executing against the assets. In their haste to transfer assets while resisting discovery in aid of execution, the Wreyfords for a time sold inventory and used equipment through Xanadu, LLC even though such assets had not yet transferred to it, and some of the credit card transactions for the business continued to flow through the Sole Proprietorship Account.

The Wreyfords did not transfer assets to benefit any creditors. The limited liability company did not assume any of the sole proprietorship's business debts. The Wreyfords retained the benefit and use of the assets after the transfers through their limited liability company free not only of their debt to LANB but also of the sole proprietorship's obligations to business creditors. The transfers of some $112,000 of unencumbered assets to the limited liability company and to fund new IRAs substantially and materially hindered LANB's ability to collect. It had the effect of subordinating LANB's claim to be paid from the value of assets transferred to

-19-

Xanadu, LLC to the creditors of the limited liability company,[18] and prevented an otherwise relatively prompt execution on LANB's judgment against the transferred assets. Thus, the Wreyfords' actions significantly affected LANB's property rights to its detriment, and substantially and materially delayed LANB's ability to collect on its judgment. *Cf. Am. Sav. & Loan Assn. v. Weber (In re Weber),* 99 B.R. 1001, 1017 (Bankr. D.Utah 1989)(stating that the "hindrance or delay [for purposes of § 727(a)(2)(A)] must significantly impact the property rights of the creditor to its detriment . . . . [and] must result in a reduction of assets available to creditors so as to substantially and materially alter or delay their ability to obtain repayment.").

After the Wreyfords' transfers of assets, the Wreyfords had little or no remaining non-exempt assets. The Chapter 7 trustee, by filing a report of no distribution in the bankruptcy case, determined there is no value in the Wreyfords' interest in the limited liability company for creditors. By the transfers, the Wreyfords effectively put all of their assets out of LANB's reach. If the Wreyfords were granted a discharge, LANB would receive nothing on its $1.4 million discharged claim.[19]

To protect itself, LANB filed an involuntary chapter 7 petition against the Wreyfords in June of 2012. The Wreyfords consulted bankruptcy counsel in early March, soon after entry of LANB's judgment and around the time they started transferring assets to their newly formed limited liability company. Bankruptcy counsel prepared the Bill of Sale by which the Wreyfords transferred inventory, equipment and accounts receivable of the sole proprietorship to the limited liability company, and consulted with the Wreyfords about transfer of the cash. If the Wreyfords, after transferring their assets to their limited liability company and to fund IRAs, and

---

[18]*See* N.M.S.A. 1978 § 53-19-44(A) (Repl. Pamp. 2001)(providing that distributions of a limited liability company's assets upon the winding up of a limited liability company are first paid to creditors, "excluding members who . . . are creditors with respect to distributions by the limited liability company").

[19]After the foreclosure sale of LANB's collateral, its deficiency claim against the Wreyfords was $1.4 million.

after claiming state law exemptions, could have averted bankruptcy for a year, they would have avoided a denial of discharge under 11 U.S.C. § 727(a)(2)(A). *See* 11 U.S.C. § 727(a)(2)(A)(applicable to transfers made within one year of the filing of the petition). LANB, however, thwarted this possibility by commencing an involuntary Chapter 7 case.

Mr. Wreyford's testimony that he was not at all motivated by the State Court Lawsuit when forming Xanadu, LLC, and that he had no concern at the time that the Wreyfords might lose the State Court Lawsuit is not credible. LANB had sued the Wreyfords for over two million dollars on a personal guaranty of a business loan in default. The prospect of having a two million dollar judgment entered against them must have worried the Wreyfords. Mr. Wreyford's testimony that the LANB judgment against him was not a factor that motivated him to capitalize Xanadu, LLC in March and May 2012, likewise is not credible. Instead of candidly admitting this at trial, Mr. Wreyford strenuously maintained the implausible position that the State Court Lawsuit had no bearing on the formation of Xanadu, LLC, and that the transfers of sole proprietorship assets to the newly formed entity were not motivated even in part by entry of the judgment.

In fact, the Wreyfords had several motives for forming a limited liability company, transferring the assets of their sole proprietorship to the limited liability company, and funding new IRAs. As discussed above, the Wreyfords formed their limited liability company, transferred the sole proprietorship's assets to it, and transferred funds from the Money Market Account and Sole Proprietorship Account to the Xanadu LLC Account and to fund their IRAs for the purpose of preventing LANB from executing its judgment against their assets. But the Wreyfords also wanted to protect their business from being dismantled by LANB's collection efforts, preserve their only source of income, have at least a modest amount of retirement funds

in the event LANB was successful in its collection efforts, and not be forced to move from their home located on the leased business premises.

A legitimate business purpose for transferring assets can negate fraudulent intent under 11 U.S.C. § 727(a)(2)(A). *See Brown,* 108 F.3d at 1293 (explaining that under the circumstances of that case a business purpose for the transfer required a finding of no fraudulent intent)(citing *Mcorp Mgmt. Solutions, Inc. v. Thurman (In re Thurman),* 901 F.2d 839, 842 (10th Cir. 1990)). In *Brown,* the debtor granted a security interest in his only unencumbered asset, an antique car collection, in an arms-length transaction four day before commencing his voluntary Chapter 7 bankruptcy case so that a corporation in which the he owned a fifty percent interest could obtain much needed capital to pay attorneys and suppliers. *Brown,* 108 F.3d at 1293. The corporation was the debtor's only source of income. *Id.* In his bankruptcy case, the debtor successfully exempted his equity in the pledged assets. *Id.* The Tenth Circuit observed that "[t]here was no evidence that the money was not reasonably used or that it was squandered[,]" and determined that the "granting of a security interest in [the debtor's] only unencumbered asset in order to obtain much needed capital for his businesses, which were his sole source of income, does not evince fraud." *Id.* Consequently, the Tenth Circuit reversed the bankruptcy court's denial of discharge under 11 U.S.C. § 727(a)(2)(A) based on its finding of a transfer made with intent to defraud a creditor. The Tenth Circuit in *Brown* did not, however, address the criteria a court should apply to determine under what circumstances a legitimate business motive for transferring property negates what would otherwise be a debtor's fraudulent intent to hinder or delay a creditor's collection efforts.

In light of the surrounding facts and circumstances, the Court finds that the Wreyfords' fraudulently intended to hinder and delay LANB, notwithstanding the fact that Wreyfords also

made the transfers to save their business, which is their only source of income, and be forced to move from their home. The timing of the formation and funding of their limited liability company with respect to the State Court Lawsuit and the entry of LANB's judgment against them, combined with the magnitude of the transfers relative to their net worth, sufficiently establish that the Wreyfords intended to hinder, delay, or defraud LANB within the meaning of 11 U.S.C. § 727(a)(2)(A).

Similarly, even though the Wreyfords had a legitimate reason to fund their IRAs in an effort to save for retirement, having lost their retirement savings to the investment that resulted in the State Court Lawsuit, such transfers were made shortly after LANB obtained its judgment, were made in tandem with the transfer of business assets to Xanadu, LLC, and consumed the last remaining assets upon which LANB could have executed. And while a debtor's conversion of a non-exempt asset to an exempt asset on the eve of bankruptcy alone is often insufficient to deny a debtor's discharge,[20] here, the funding of the Wreyfords' IRAs is just one of several transfers that effectively removed all of the Wreyfords' assets from LANB's reach if the Wreyfords were granted a discharge.

### Both Mr. and Mrs. Wreyford's Discharge Should Be Denied

Finally, although Mrs. Wreyford did not technically participate in the transfers from the Money Market Account, she is equally culpable for the transfers. She condoned them and approved them. Even though the Money Market Account reflects that it was held by Mr. Wreyford, there is a presumption that Mrs. Wreyford had a community property interest in the funds. *See* N.M.S.A. 1978 § 40-3-12(A) (Repl. Pamp. 1999)("property acquired during marriage by either husband or wife, or both, is presumed to be community property."); *Swink v. Sunwest*

---

[20]*See Carey,* 938 F.2d at 1077 ("'[T]he desire to convert assets into exempt forms by itself' does not constitute actual intent to defraud" for purposes of 11 U.S.C. § 727(a)(2))(quoting *In re Johnson,* 880 F.2d 78, 81 (8th Cir. 1989)).

*Bank (In re Fingado),* 113 B.R. 37, 40 (Bankr.D.N.M. 1990), *aff'd* 995 F.2d 175 (10th Cir.

1993)(acknowledging that under New Mexico law "there is a clearly stated presumption of

community property.")(citation omitted)). Thus, 11 U.S.C. § 727(a)(2)(A)'s requirement that the

property transferred belong to the debtor has been satisfied as to Mrs. Wreyford. Mrs. Wreyford

also signed the Bill of Sale which transferred all of the assets of the sole proprietorship to

Xanadu, LLC. *See* Exhibit 28. Mrs. Wreyford's approval of Mr. Wreyford's transfers and active

participation in the funding of Xanadu, LLC after the entry of LANB's judgment against her

establishes that Mrs. Wreyford acted with actual intent to hinder, delay or defraud LANB.

CONCLUSION

Based on the foregoing, the Court finds and concludes that the Wreyfords transferred

property within one year before the commencement of their bankruptcy case with actual intent to

hinder, delay, or defraud a creditor, that such transfers substantially and materially hindered or

delayed LANB's ability to collect on its judgment, and that the surrounding facts and

circumstances establish that the Wreyfords acted with fraudulent intent sufficient to warrant the

denial of their under 11 U.S.C. § 727(a)(2)(A). In reaching this conclusion, the Court makes no

inference based on the Wreyfords' alleged conduct that LANB asserts forms the basis of its

remaining claims under 11 U.S.C. § 727(a). The Court enters these findings of fact and

conclusions of law in accordance with Fed.R.Bankr.P. 7052, and will enter a separate judgment.

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: February 4, 2014

-24-

COPY TO:

**James Jurgens**
Attorney for Plaintiff
100 La Salle Cir Ste A
Santa Fe, NM 87505-6976

**Donald A. Walcott**
Attorney for Defendants
200 W. Marcy St. #142
Santa Fe, NM  87504